[Cite as *In re K.M.L.*, 2018-Ohio-344.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | | |

IN RE: K.M.L.

C.A. No.     17AP0009

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.    12-1354-CCV

DECISION AND JOURNAL ENTRY

Dated: January 29, 2018

CARR, Judge.

{¶1} Appellant Samantha Fosen ("Mother") appeals the decision of the Wayne County Court of Common Pleas, Juvenile Division, which expanded the parenting time of Appellee Derek Richardson ("Father") with his son, K.M.L. (d.o.b. March 22, 2011). This Court affirms.

I.

{¶2} Mother and Father have never been married and no longer have a relationship. Mother has always had custody of K.M.L. In 2012, Father filed a motion seeking unsupervised visitation and a motion for the adoption of a shared parenting plan. Ultimately, in 2013, the parties entered into an agreed judgment entry which provided that Mother would be named the residential parent and legal custodian of K.M.L. Father was initially to have limited parenting time, which was to expand to the standard order provided for in the local rules when K.M.L. turned three years old.

{¶3}    In February 2016, Father filed a motion to, inter alia, modify parental rights and responsibilities.  That matter proceeded to a trial before a magistrate, at the beginning of which Father indicated that his motion was limited to seeking increased parenting time with K.M.L.  Following the trial, the magistrate issued a decision granting Father's motion, concluding it was in the best interests of K.M.L.  The magistrate found that Father's visitation would "conform to the times Mother is off work[,]" that weekend visitation would continue every other weekend from Friday to Sunday, that the drop-off/pick-up would be changed to the parents' residences on weekends, and to school during the week when school was in session, and also provided that Father's midweek parenting time would be modified so that Father would have overnight parenting time with K.M.L. every other Monday and every other Thursday.  The trial court issued a judgment entry adopting the magistrate's conclusions.  Both parties filed objections, some of which related to confusion over the times for parenting time.  The trial court remanded the matter for the magistrate to conduct a status conference.  Following the status conference, the magistrate issued a decision amending the prior decision.  Apparently, at that status conference, the magistrate was provided with information that Mother was no longer employed and that Father's work schedule had changed.[1]  The magistrate also noted that the prior decision did not indicate when the new schedule of parenting time would commence.  The magistrate removed the reference to Father's parenting time conforming to when Mother was off work and specified the dates upon which the new schedule would commence.  Finally, the magistrate indicated that all other orders not addressed should remain the same.  The trial court entered judgment the following day, adopting the magistrate's conclusions.  Mother filed additional objections, and,

---

[1] A transcript of the status conference is not part of this Court's record.

following the filing of the transcript of the trial, supplemental objections, which the trial court ultimately overruled.

{¶4} Mother has appealed, raising a single assignment of error for our review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT, MS. FOSEN, AND ABUSED ITS DISCRETION WHEN THE TRIAL COURT GRANTED THE APPELLEE, MR. RICHARDSON'S MOTION TO EXPAND VISITATION WITH THE PARTIES' MINOR CHILD.

{¶5} Mother argues in her sole assignment of error that the trial court abused its discretion in overruling her objections to the magistrate's decision and granting Father expanded parenting time with K.M.L. Mother maintains that Father failed to meet his burden to demonstrate that the new parenting time order was in K.M.L.'s best interests. We do not agree.

{¶6} "[W]e generally review a trial court's action on a magistrate's decision for an abuse of discretion, but do so with reference to the nature of the underlying matter." (Internal quotations and citations omitted.) *Harrison v. Lewis*, 9th Dist. Summit No. 28114, 2017-Ohio-275, ¶ 40. "We review a decision regarding parenting time for an abuse of discretion." *Id.*, quoting *In re C.F.*, 9th Dist. Wayne No. 14AP0053, 2015-Ohio-5537, ¶ 16, quoting *Pirkel v. Pirkel*, 9th Dist. Lorain No. 13CA010436, 2014-Ohio-4327, ¶ 9. "[I]n the absence of a shared parenting plan, motions to modify parenting time are analyzed under R.C. 3109.051 * * *." *Pirkel* at ¶ 6. "When a trial court determines parenting time under R.C. 3109.051, it must do so consistent with the best interests of the children involved with consideration of the factors mentioned in R.C. 3109.051(D)." *Id.* at ¶ 9. "A trial court need not make explicit reference to these factors provided that it is apparent from the record that the factors were considered." *Id.*

{¶7} R.C. 3109.051(D) provides:

In determining whether to grant parenting time to a parent pursuant to this section or section 3109.12 of the Revised Code or companionship or visitation rights to a grandparent, relative, or other person pursuant to this section or section 3109.11 or 3109.12 of the Revised Code, in establishing a specific parenting time or visitation schedule, and in determining other parenting time matters under this section or section 3109.12 of the Revised Code or visitation matters under this section or section 3109.11 or 3109.12 of the Revised Code, the court shall consider all of the following factors:

(1)  The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child;

(2)  The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;

(3)  The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4)  The age of the child;

(5)  The child's adjustment to home, school, and community;

(6)  If the court has interviewed the child in chambers, pursuant to division (C) of this section, regarding the wishes and concerns of the child as to parenting time by the parent who is not the residential parent or companionship or visitation by the grandparent, relative, or other person who requested companionship or visitation, as to a specific parenting time or visitation schedule, or as to other parenting time or visitation matters, the wishes and concerns of the child, as expressed to the court;

(7)  The health and safety of the child;

(8)  The amount of time that will be available for the child to spend with siblings;

(9)  The mental and physical health of all parties;

(10)  Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

(11)  In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that

resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the person, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that the person has acted in a manner resulting in a child being an abused child or a neglected child;

(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;

(16) Any other factor in the best interest of the child.

**{¶8}** On appeal, Mother essentially argues that Father failed to demonstrate that the order of the court which granted Father "four midweek overnight visits per month" was in the best interests of K.M.L.

**{¶9}** We note that in addition to the testimony discussed below, following the initial magistrate's decision, upon order of the trial court, the magistrate also held a status conference

with the parties' counsel and the GAL, which appears to have resulted in the magistrate obtaining additional information about Mother's and Father's schedules. That information appears to have included evidence that Mother was no longer working. There is no transcript of this status conference or affidavit in the record; thus, neither the trial court judge, nor this Court has the benefit of considering that information in evaluating the best interests of K.M.L. *See* Juv.R. 40(D)(3)(b)(iii). Accordingly, to the extent any of Mother's objections challenged issues specific to factual information provided at the status conference, the trial court had no choice but to overrule the objections given the absence of a transcript or affidavit. *See Weitzel v. Way*, 9th Dist. Summit No. 21539, 2003-Ohio-6822, ¶ 21; Juv.R. 40(D)(3)(b)(iii).

{¶10} However, the magistrate found it in K.M.L.'s best interests to expand Father's parenting time even before the status conference, based solely upon the evidence set forth at trial. That evidence is properly in our record. Therefore, we will consider Mother's argument in light of the evidence presented at trial.

{¶11} At the time of trial, both Father and Mother were remarried. Mother, Mother's husband, Mother's daughter, and K.M.L., who was five, lived together in Rittman. Father and Father's wife lived in Brunswick. There was testimony that Mother and Father lived approximately 40 to 45 minutes apart and that they used to be closer to 20 to 25 minutes apart when Father lived in Medina. Father moved to Brunswick in March or April 2014, and married his wife in the fall of 2014. Father and his wife moved to Brunswick to be closer to his wife's family and because they believed that Brunswick had better schools. The increased distance from K.M.L. did not factor into their decision. The GAL did not view the increased distance between the two homes as anything to be concerned about. However, Mother viewed the distance as problematic. Mother was concerned that it would take about an hour for Father to

take K.M.L. to school and that K.M.L. would thus have to get up very early. Mother had concerns that K.M.L. might not get enough sleep and that he would spend so much time in the car that it would interfere with his play time after school. Mother noted that K.M.L. would be transitioning from preschool to kindergarten, and therefore, would be spending many more hours in school. Mother felt that granting Father the parenting time in Father's proposed schedule (which amounted to a near 50/50 split) would amount to too much change for K.M.L.

{¶12} Beginning when K.M.L. turned three, Father's parenting time was expanded to the parenting time provided for in the local rules, which meant that he saw K.M.L. from 4:30 p.m. to 8:00 p.m. every Wednesday and every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m. The exchanges would take place at a police department. Both parties acknowledged that the transitions were particularly difficult for K.M.L. Mother would also allow Father and K.M.L to speak on the phone but the phone would be on speakerphone and Mother would monitor the calls.

{¶13} Father worked 12 hour shifts and worked every other weekend. In 2016 when he switched from working nights to days, every other Wednesday his wife began picking up K.M.L. at 4:30 p.m. for the midweek visitation due to Father's work schedule. Because Mother read the agreed judgment entry as requiring Father to be available for the parenting time she began declining to bring K.M.L. to the exchange point until Father was available. Mother offered to extend Father's Friday parenting time instead when Father was available, but Father maintained that he was entitled to the Wednesday parenting time irrespective of whether he could be present for all of it. This conflict resulted in Father only having Wednesday parenting time with K.M.L. every other week. Mother acknowledged that, prior to the confusion about the Wednesday parenting time, Father had not missed parenting time with K.M.L. unless K.M.L. was sick.

{¶14} Mother and Father admittedly had difficulty communicating and were described by the guardian ad litem (GAL) as being polar opposites when it came to communication. The GAL reported that the parents' communication during transitions was confusing and hurtful to K.M.L. and that each parent blamed the other for failures in communication. Mother felt that Father was dismissive of Mother during transition times and that sometimes, when K.M.L was being defiant, Father became very stern with K.M.L., and threatened punishment if K.M.L. did not comply. The GAL thought that the tension could be improved by Mother and Father adhering to the schedule the court would order, thereby eliminating extraneous conversation, by Father contacting K.M.L.'s doctors, counselors, and teachers to keep himself informed of the information and appointments, and by the parents engaging with K.M.L.'s counselor to learn what they could do to make the transitions easier for K.M.L. The GAL did not recommend that Mother and Father engage in joint counseling together as they were not in a relationship or trying to have a friendship and felt that it would be better for K.M.L. if the parents engaged with K.M.L.'s counselor. Mother believed that she and Father should engage in joint counseling in light of a recommendation made by one of K.M.L.'s physicians in 2014.

{¶15} Prior to trial, K.M.L. had been in trauma-focused cognitive behavior therapy. Both Mother and Father had participated in the sessions with K.M.L. with the therapist as she would request. Initially, when the therapy began, it was reported to the therapist that K.M.L. made comments while at Mother's house to the effect of that Father was going to shoot Mother. The GAL indicated that a police report was filed but nothing ever became of the investigation, however, it was recommended that K.M.L receive therapy. The GAL noted that the therapist reported no known current causes for trauma aside from the parenting time transitions and had diagnosed K.M.L with adjustment disorder. The GAL testified that this was exemplified by

K.M.L.'s difficulties regulating and identifying his emotions and his aggression with Mother and his sister and at school.

{¶16} The GAL recommended that K.M.L. be reengaged in therapy, which had ended when K.M.L.'s therapist went to work elsewhere. The GAL also recommended that K.M.L be evaluated for an IEP in light of his trouble regulating his emotions and his aggressive behaviors. The GAL believed that some of K.M.L.'s trauma stemmed from the tense relationship between Mother and Father. The GAL noted, and the parties agreed, that K.M.L had difficulty with the transitions between Mother and Father. The GAL reported that, during transitions, K.M.L. could react with clingy behavior towards Mother, be defiant towards both parents, display melancholy, and sometimes have temper tantrums. The GAL indicated that the language Mother would sometimes use during the transitions was alienating; Mother would tell K.M.L. that she was "sorry [K.M.L. ha[d] to go but mommy loves you[.]" The GAL averred that Mother should be encouraging K.M.L.'s time with Father, not telling K.M.L. that she is sorry that he has to go. The GAL testified that K.M.L. told her that the worst thing in his life was the police department and indicated that the transitions were really stressful for K.M.L.

{¶17} Father's wife and Father testified that, if the court increased Father's parenting time, they would ensure that K.M.L. would be transported to and from school if need be. Father's wife worked in retail and indicated that she had flexibility with her scheduling. Father averred that he and K.M.L. and his wife and K.M.L. have a very loving relationship. Father indicated that he would be interested in attending K.M.L.'s school events and field trips irrespective of whether they occurred during his parenting time. Generally, Father was interested in spending more time with K.M.L.

**{¶18}** At the time of trial, Mother also worked 12 hours shifts as a nurse and was generally working hours when Father was not. However, during Mother's testimony it became clear that Father's hours would shift again, and Father would begin working the same hours Mother was working. Mother's mother ("Grandmother") testified that when Mother was working, Grandmother and grandfather watched Mother's daughter and K.M.L. Grandmother lived a short distance from both Mother and the children's schools. Grandmother indicated that she and her husband had a very close relationship with K.M.L. and that K.M.L. was very close to his sister. Mother testified that her children love her husband and enjoy spending time with him. Mother also described how she has facilitated visitation with K.M.L.'s paternal grandparents when Father would not do so.

**{¶19}** In visiting with K.M.L., Father, and Father's wife, the GAL did not have any concerns about Father's interactions with K.M.L. and indicated that both Father and Father's wife engaged appropriately with K.M.L. The GAL observed that both Father and Father's wife had a bond with K.M.L. The GAL found K.M.L. to be very comfortable in Father's home and described Father and K.M.L.'s relationship as very loving. Moreover, the GAL did not have any concerns about Mother's parenting or interactions with K.M.L. While the GAL was able to meet with Mother, Father, Father's wife, and K.M.L., and view interactions with K.M.L. and his parents, unfortunately, due to timing issues, the GAL was not able to meet Mother's daughter or Mother's husband.

**{¶20}** The GAL indicated that K.M.L. expressed that he likes spending time with Father and Father's wife and that he wants to spend time with them. K.M.L. also indicated that "he has times when does miss [Father."] Moreover, when the GAL asked whether he would like to spend more or less time with Father and Father's wife, K.M.L. stated that he wanted to spend

more time with Father and Father's wife. Even Mother agreed that it was in K.M.L.'s best interest for Father to have "[s]ome" increase in parenting time. She thought it would be best for Father to have one to two additional evenings a month where Father would pick K.M.L. up from school, spend a couple hours with him and then bring him home. Later in her testimony, Mother acknowledged that she would not object if Father had parenting time with K.M.L. twice a week during the week for a few hours after school, instead of the single Wednesday night visitation. Mother also admitted that she believed that Father and K.M.L. had a healthy relationship "[t]o the extent of [her] knowledge." Nonetheless, Mother expressed concern over Father's proposed schedule in so far as she believed it would negatively affect K.M.L.'s relationship with his sister and his maternal grandparents. Further, Mother maintained that the transitions were easier after short visits as opposed to after the lengthy visits that happened on the weekends.

{¶21} Ultimately, the GAL recommended that Father have "liberal visitation" as well as "open and free communication" with K.M.L. The GAL's report provided that Father "should have *a minimum* of Local Rule 11 visitation time with [K.M.L.]" and that "liberal visitation" was encouraged. (Emphasis added.) The GAL had no concerns about Father and K.M.L. having unmonitored communication. The GAL felt that monitored communication might inhibit K.M.L. from speaking openly and honestly with Father in light of the tense relationship between the parents. The GAL thought the schedule proposed by Father would be appropriate, which seemed to amount to a near equal split in parenting time. The GAL also suggested that Father should have a right of first refusal with respect to time when Mother would need to seek out a third party to watch K.M.L. if Father was available. The GAL acknowledged that the schedule would result in more transitions, which would prove challenging for K.M.L. However, the GAL hoped that the parents would work with K.M.L.'s counselor to improve their communication

during transitions in order to make K.M.L. more comfortable. Additionally, the GAL agreed that longer time periods between transitions, such as what was in Father's proposed schedule, would be in K.M.L.'s best interest as it would allow him time to relax after the transition and spend quality time with Father before having to transition back to Mother. The GAL acknowledged that expanding parenting time would decrease K.M.L.'s time with his sister but did not feel that it would be detrimental to him.

{¶22} After considering the evidence before the trial court and the factors set forth in R.C. 3109.051(D), we cannot say the trial court abused its discretion in overruling Mother's objections and granting Father's motion to expand Father's parenting time. We note that the trial court did not adopt Father's schedule and instead only expanded Father's parenting by approximately four overnight visits a month. The weight of the evidence supports that K.M.L. has a loving relationship with Mother, Mother's husband, Father, Father's wife, Mother's daughter, and K.M.L.'s maternal grandparents. However, the evidence also supports that K.M.L. wanted to spend more time with Father. While Mother expressed concern about the distance between Father and Mother, and the associated increased travel time, the GAL did not find that distance to pose a barrier to expanding visitation. The GAL also acknowledged that transitions were difficult for K.M.L., nonetheless, that did not change her recommendation that Father have liberal visitation of at least the amount provided for by the local rules. In fact, even Mother testified that Father should have "[s]ome" expansion in his parenting time and acknowledged that Father and K.M.L. have a heathy relationship.

{¶23} Mother argues that Father has failed to agree to previously recommended joint counseling to address the stress transitions place on K.M.L.; however, the record is clear that Father went to K.M.L.'s therapy appointments as the therapist would request and that the GAL

did not believe that joint counseling was a good idea for the parents. In light of the record, the trial court was well aware of the parties' difficulties in communicating and of the challenges that the transitions between parents created for K.M.L., some of which were arguably caused or amplified by the parties' difficulties communicating. The order of the trial court appears to attempt to balance these concerns, as well as K.M.L.'s concerns over the transitions happening at the police station. During the school year, the midweek transitions would no longer involve both parents, as Father would pick up K.M.L. at school and return him to school, thereby hopefully decreasing some of the tension that midweek transitions created for K.M.L. And while the weekend visitation exchanges would still involve both parents, they would no longer involve the police station; instead, K.M.L. would leave from, and be picked up at, places he enjoyed spending time. Further, the adoption of a schedule that provided for longer stretches of visitation time corresponds to the GAL's preference and the preference stated in the court's local rules. *See* Loc.R. 11(C) of the Court of Common Pleas of Wayne County, Juvenile Division ("Liberal visitation is encouraged by the Court, taking into account the number of children, their ages, and the geographic proximity of the parties. The visitation schedule, to the extent possible, should encourage periods of visitation of significant duration and minimize frequent shifting of the children back and forth between their parents."). Additionally, the trial court could have reasonably concluded that, even though K.M.L. would be experiencing significant changes as he started kindergarten, it would nonetheless benefit him to spend more time with Father, who could, like Mother, offer K.M.L. support as he begins school. Overall, we cannot say that Mother has demonstrated that the trial court abused its discretion in expanding Father's parenting time or that such was not in K.M.L.'s best interests.

{¶24} Mother's assignment of error is overruled.

III.

{¶25} Mother's assignment of error is overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

SCHAFER, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

NORMAN R. "BING" MILLER, JR., Attorney at Law, for Appellant.

REBECCA A. CLARK, Attorney at Law, for Appellee.